IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Charles Mavins, Jr., ) | C/A No. 0:14-1119-RBH-PJG |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Carolyn W. Colvin, Acting Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 (D.S.C.). The plaintiff, Charles Mavins, Jr., brought this action pursuant to 42 U.S.C. § 1383(c)(3) to obtain judicial review of a final decision of the defendant, Acting Commissioner of Social Security ("Commissioner"), denying his claims for Supplemental Security Income ("SSI"). Having carefully considered the parties' submissions and the applicable law, the court concludes that the Commissioner's decision should be affirmed.

## SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 1382c(a)(3)(H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); see also Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1973). The regulations generally require the ALJ to consider, in sequence:

  (1)  whether the claimant is engaged in substantial gainful activity;

  (2)  whether the claimant has a "severe" impairment;

  (3)  whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), and is thus presumptively disabled;

  (4)  whether the claimant can perform his past relevant work; and

  (5)  whether the claimant's impairments prevent him from doing any other kind of work.

20 C.F.R. § 416.920(a)(4).[1] If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. Id.

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform alternative jobs that exist in the national economy. 42 U.S.C. § 1382c(a)(3)(A)-(B); see also McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980). The Commissioner may carry this burden by obtaining testimony from a vocational expert. Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

---

[1] The court observes that effective August 24, 2012, ALJs may engage in an expedited process which permits the ALJs to bypass the fourth step of the sequential process under certain circumstances. 20 C.F.R. § 416.920(h).



**ADMINISTRATIVE PROCEEDINGS**

In February 2011, Mavins applied for SSI, alleging disability beginning February 10, 2011. Mavins's application was denied initially and upon reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). A hearing was held on December 20, 2012 at which Mavins, who was represented by Jenna Abel, Esquire, appeared and testified. After hearing testimony from a vocational expert, the ALJ issued a decision on January 18, 2013 denying benefits and concluding that Mavins was not disabled. (Tr. 16-25.)

Mavins was born in 1976 and was thirty-four years old at the time his application was filed. (Tr. 129.) He has a ninth-grade education and past relevant work experience as a yard worker. (Tr. 155.) Mavins alleged disability due to a schizophrenia, anxiety, and seizures. (Tr. 154.)

In applying the five-step sequential process, the ALJ found that Mavins had not engaged in substantial gainful activity since February 10, 2011—the date his application was filed. The ALJ also determined that Mavins's bipolar disorder and personality disorder were severe impairments. However, the ALJ found that Mavins did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). The ALJ further found that Mavins retained the residual functional capacity to

> perform work with restrictions that require simple, routine task; no reading or writing beyond unskilled level; a supervised environment; no required interaction with the public or "team"-type interaction with co-workers; no climbing of ladders or scaffolds; and avoidance of unprotected heights and machinery with exposed hazardous moving parts.

(Tr. 19.) The ALJ found that Mavins had no past relevant work, but that there were jobs that existed in significant numbers in the national economy that Mavins could perform. Therefore, the ALJ



found that Mavins had not been under a disability since February 10, 2011—the date the application was filed.

Mavins submitted additional evidence to the Appeals Council, which denied his request for review on January 30, 2014, making the decision of the ALJ the final action of the Commissioner. (Tr. 1-4.)  This action followed.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  Thus, the court may review only whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied.  See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589.  In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Id. Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence. Blalock, 483 F.2d at 775.

## ISSUES

Mavins raises the following issues for this judicial review:

I.      The ALJ's decision is not supported by substantial evidence; and



  II.  The ALJ improperly discounted the opinion of one of Mr. Mavins' treating physicians.

(Pl.'s Br., ECF No. 15.)

## DISCUSSION

**A. Mavins's Non-Compliance**

Mavins first contends that the main reason the ALJ offered for rejecting Mavins's reports of limiting effects from his impairments was that "[t]he medical evidence clearly establishes that the claimant's mental disorders are effectively managed, controlled, and stable with medication and compliance in taking medication and mental health counseling." (Tr. 23.) Mavins also points out that the ALJ also noted that "although the claimant may experience some of his mental symptoms at times, his symptoms are minimal with medical compliance." (Tr. 23.) Mavins argues that these findings are unsupported by substantial evidence, rendering the ALJ's evaluation of Mavins's credibility similarly unsupported.

Mavins points to records from the Lexington County Mental Health Clinic ("LCMHC") dated July, August, and September 2011 and May, June, August, and October 2012 which indicate that he was taking his medication regularly but still experiencing symptoms. The records from LCMHC contain a section entitled "Medications Use," and each of the records pointed out by Mavins indicate under this heading "Taking regularly: ✔ Yes." (See Tr. 350, 352, 354, 481, 484, 487, & 490.) Mavins argues that despite indications that he was taking his medication regularly on these occasions, the records reveal that in July 2011 Mavins reported that he was agitated, frustrated, and angry (Tr. 350); in August 2011 he reported that he was not doing well and starting to hear more voices (Tr. 352); in September 2011 he stated that he still has some auditory hallucinations but that



it was better than it was and he was less agitated/irritable and sleeping better (Tr. 354); in May 2012, Mavins reported that his mood was a little better now; described feeling depressed two months ago and an overdose situation; and indicated that he still experienced some periods of anger, paranoia, and auditory hallucinations at times (Tr. 481); and in June 2012, he reported thoughts of hurting himself or others and he indicated he just dealt with it the best that he could but directs his thoughts towards breaking glass or other objects rather than directing his anger toward other individuals (Tr. 484). Further, these records reflected Global Assessment of Functioning ("GAF") scores ranging from 45 in July 2011 to 52 in August and October 2012.[2]

Although all of the records that Mavins relies on indicated that he was taking his medication regularly, these records contain additional information regarding Mavins's compliance that indicate he was not entirely compliant with his medications and failed to attend his mental health counseling. For example, the record in July 2011 reveals that this visit occurred one week after he presented to the emergency room reporting increased symptoms and that he had not taken his Geodon for three weeks. (Tr. 328, 350.) Also in July 2011 Mavins asked to try a different medication. (Tr. 350.)

---

[2] With regard to GAF scores, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fourth edition ("DSM-IV"), contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning. A GAF score may reflect the severity of symptoms or impairment in functioning at the time of the evaluation. Id. at 32-33. According to the DSM-IV, a GAF score between 41 and 50 may reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34. A GAF score between 51 and 60 may reflect "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)." Id. Importantly, a "[p]laintiff's GAF score is only a snapshot in time, and not indicative of [his] long term level of functioning." Parker v. Astrue, 664 F. Supp. 2d 544, 557 (D.S.C. 2009). Further, the court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF. American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed. 2013) ("DSM-V").



However, in August 2011, Mavins reported agitation from the new medication and asked to be returned to the medication he was prescribed while in the hospital. (Tr. 352.)  Moreover, in September 2011, Mavins indicated that although he had some auditory hallucinations, he reported improvement.  Additionally, contrary to indication that Mavins was properly taking his medications in May, June, and August 2012, (1) his May 2012 records reveal that Mavins overdosed on his medications in March 2012, that he forgot to take home his patient assistance program for Lamictal (for his depression) at his appointment in March 2012 and therefore had not started this prescribed medication as of his May 2012 appointment, and that he had been unable to afford his Valium; (2) his June 2012 records reveal that he ran out of his Valium early because he thought he was supposed to take it as needed; and (3) his August 2012 records state that Mavins was "currently taking meds but period of not taking Lamictal due to difficulty w/ transportation & unreliable living situation." (Tr. 487; see also Tr. 481, 484.)  There are no records from October 2011, from December 2011 through February 2012, or from April, July, or September 2012, and other records expressly state that Mavins was not seeing his therapist and was missing appointments. (Tr. 382, 481, 484.)

Further, the ALJ's opinion reflects that in evaluating Mavins's credibility and in determining Mavins's residual functional capacity, the ALJ discussed Mavins's medical records at length.  He stated that Mavins was psychiatrically hospitalized in December 2006, secondary to decompensation of schizophrenia, and observed that Mavins had been noncompliant with his medications and had been abusing crack cocaine.  The ALJ found that Mavins "improved significantly with Geodon, and at discharge, his affect was bright and appropriate, and he denied suicidal or homicidal ideas, visual or auditory hallucinations, or delusions" and that outpatient treatment was recommended. (Tr. 20-21.)  The ALJ found no indication that further psychiatric hospitalization, treatment, or counseling



was required due to his schizophrenia or any other mental disorder between December 2006 and his incarceration in March 2008. The ALJ explained that records from the South Carolina Department of Corrections ("SCDC") revealed that Mavins "was incarcerated March 14, 2008, through February 1, 2011, due to 2nd degree burglary and cocaine possession." (Tr. 21.) The ALJ also found that

> [w]hile incarcerated, the claimant received mental health counseling and was stable and "symptom-free" due to compliance with the medication, Geodon. He had good attitude, good judgment, good mood, and normal speech. He had no suicidal or homicidal ideation. He had no detrimental side effects to his medication. At discharge, continued mental health treatment was recommended (Exhibit 2F, 3F).

(Id.) The ALJ further observed that Mavins was arrested on March 5, 2011 for driving without a license, and records of Mavins's interview revealed that he admitted drinking alcohol occasionally, denied "symptoms such as shortness of breath, cough, fatigue, loss of appetite, night sweats, feelings of hopelessness, and suicidal ideation," and "did not exhibit any abnormal behavior, restricted movement, disorientation, or unsteady gait." (Id.)

The ALJ observed that following Mavins's release from SCDC in February 2011, Mavins

> presented to the mental health center on February 17, 2011, without any significant mental symptoms other than complaints of some paranoia. He was essentially stable and stated he was doing well on his medication; however, he admitted he had run out of medications for days. His global assessment of functioning (GAF) was 55. His follow up sessions revealed he remained stable as long as he was medically compliant. His GAF in May 2011 was 60. He reported being less irritable, having improved sleep, and less hallucinations. Further mental health counseling records show the claimant's symptoms were variable, but that the claimant was not compliant with medication, allegedly due to finances. His alleged symptoms were some periods of anger, irritability, decreased sleep, depression, paranoia, auditory hallucinations, low energy, poor appetite, and poor concentration. The claimant was treated with a variety of psychotropic medications including Geodon, Tegretol, Ability, Trazodone, Tegretol, Valium, Fanapt, and Lamictal. His primary diagnoses were bipolar I disorder and personality disorder, NOS (Exhibit 5F, 9F).

(Tr. 21.) The ALJ stated that on June 29, 2011, Mavins presented to the emergency room reporting that he felt like he was going into a manic phase and admitting that he was noncompliant in taking Geodon for three weeks. The ALJ observed that Mavins did not require inpatient treatment. (Tr. 22) (citing Tr. 332).

The ALJ found that Mavins's mental health progress summary from July 31, 2011 to October 29, 2011 revealed that Mavins "failed to show for scheduled appointments, allegedly due to transportation problems" and that a progress summary from October 29, 2011 to January 27, 2012 indicated that Mavins "had not met with his counselor, had not responded to requests to schedule an appointment, and had not received therapy services during this review period" and that at his last session, Mavins denied symptoms other than passive suicidal ideation. (Tr. 22.) The ALJ found that the report demonstrated that Mavins "required continued treatment to maintain stability and prevent decompensation." (Id.) The ALJ stated that when Mavins returned in March 2012 "he admitted to having two relapses using cocaine since January 2011, even though he had previously claimed he had been clean since 2006" and that Mavins indicated that he "was out of Valium and had not started previously prescribed Lamictal." (Id.) Finally, the ALJ observed that Mavins's GAF from March 2012 to August 2012 remained stable at 52.

Therefore, upon review of the ALJ's decision, the record, and the parties' briefs, the court finds that although Mavins may point to some evidence that Mavins was experiencing symptoms while he may have been compliant with his medications, the court cannot say that the ALJ's findings based on the medical evidence as a whole is unsupported by substantial evidence. In fact, the ALJ's findings and discussion of the medical evidence appear to be comfortably within the bounds of substantial evidence. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (defining "substantial

evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" and stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1973) (indicating that regardless of whether the court agrees or disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence).

Moreover, in evaluating Mavins's credibility and performing the residual functional capacity assessment, the ALJ considered more than just Mavins's symptoms when he was compliant with medication. In addition to the medical records, the ALJ discussed Mavins's activities of daily living which the ALJ found included reporting in March 2011 that he "fed and played with his puppy, that he had no problem with personal care, and that he washed dishes, raked the yard, went out to eat three times a week, and went to church sometimes," as well as reporting that "he enjoyed dancing, listening to music, and playing cards" and confirming that he did not use any assistive devices." (Tr. 22.) The ALJ observed that in September 2011, Mavins "reported that he made sandwiches, mowed the yard once a month, shopped in stores for clothing and shoes, sat outside in the yard with the family, and took part in family gatherings once in a while" and "again confirmed he did not use any assistive devices." (Id.) Also in the opinion, the ALJ observed that Mavins had "no vocationally relevant past work experience" and "gave inconsistent reports regarding his level of education." (Tr. 20.)

In conclusion in addressing Mavins's credibility, the ALJ found that Mavins "repeatedly failed to follow prescribed treatment, which indicates his symptoms were not as severe as alleged.



The claimant's inconsistent reports regarding his abstinence of substance use except alcohol since 2006 further diminishes his overall credibility." (Tr. 22.) The ALJ further stated in discussing Mavins's residual functional capacity that

> the medical evidence clearly establishes the claimant's mental disorders are effectively managed, controlled, and stable with medication and compliance in taking medication and mental health counseling. The medical evidence also clearly shows the claimant was not compliant in following prescribed treatment, which resulted in exacerbation of his mental symptoms. There is no evidence the claimant experienced any significant detrimental side effects related to his medications. The claimant has not required psychiatric hospitalization since 2006. Although the claimant may experience some of his mental symptoms at times, his symptoms are minimal with medical compliance. The claimant is able to perform a variety of daily activities without assistance, engage in social activities with family, and behave appropriately in public. The medical evidence demonstrates the claimant has the capacity to understand, remember, and carry out simple instructions for at least two-hour periods of time; maintain personal hygiene; make simple work-related decisions; recognize and avoid normal workplace hazards; and use public transportation. He may occasionally miss a day of work secondary to his symptoms, particularly if he is not medically compl[ia]nt. The claimant may require a supervised environment in light of his history of noncompliance. He may have difficulty working in close proximity or coordination with co-workers and would be best suited for a job that does not require interaction with the public or "team"-type interaction with coworkers. Because the claimant's medication may cause some sedation or drowsiness, he should not climb ladders or scaffolds or work around unprotected heights and machinery with exposed, hazardous moving parts. Due to his limited education, the claimant should not be required to read or write beyond the unskilled level.

(Tr. 23.)

Therefore, based upon all of the foregoing, Mavins has failed to demonstrate that remanded is warranted on this basis. See, e.g., Craig, 76 F.3d at 594-95 (explaining the two-step process for the consideration of subjective complaints); 20 C.F.R. § 416.929(c)(3) (listing the relevant factors for evaluating subjective complaints).

B.   **Dr. Felicitas Bugarin**

Mavins next argues that the ALJ improperly gave no significant weight to the opinion of Dr. Felicitas Bugarin, Mavins's treating psychiatrist. Typically, the Social Security Administration accords greater weight to the opinion of treating medical sources because treating physicians are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*). Rather, a treating physician's opinion is evaluated and weighed "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Any other factors that may support or contradict the opinion should also be considered. 20 C.F.R. § 416.927(c)(6). In the face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such an opinion. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Further, " 'if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.' " Id. (quoting Craig, 76 F.3d at 590).

Additionally, SSR 96-2p provides that

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating



> source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p, 1996 WL 374188, at *5. This Ruling also requires that an ALJ's decision "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Id., at *5.

On May 24, 2011, Dr. Bugarin completed a medical source statement, indicating that she first treated Mavins on February 1, 2011 and that the most recent treatment date was May 17, 2011. (Tr. 259-61.) The ALJ summarized this statement as follows:

> Dr. Felic[i]tas Bugarin, the claimant's former treating psychiatrist, completed a medical assessment indicating that the claimant had delusions, hallucinations, and thought disorganization that resulted in moderate limitations in his ability to understand, remember, and carry out simple instructions; interact appropriately with co-workers; and respond appropriately to changes in a usual work setting. Dr. Bugarin indicated the claimant had marked limitations in his ability to carry out detailed instructions, make judgments on simple work-related decisions, interact appropriately with the public and supervisors, and respond appropriately to work pressures in a usual work setting. [She] added the claimant had no restriction in daily activities; that he had marked difficulties in maintaining social functioning, frequent difficulties in marked deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and that the claimant had continual episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors) (Exhibit 5F, pages 2-4).

(Tr. 21-22.) The ALJ gave this opinion no significant weight, stating that "the assessment is based on a short period of treatment and is not supported by the treatment records for the time period specified or by the treatment records thereafter, by the claimant's GAF rating of 60 as of the date of

the assessment, or by the claimant's activities of daily living. The records confirm the claimant was essentially stable from a mental standpoint with medical compliance." (Tr. 24.)

Upon review of the ALJ's decision and the record, the court concludes that the ALJ appears to have applied the relevant factors in evaluating Dr. Bugarin's opinion and finds that Mavins has failed to demonstrate that the ALJ's decision to afford no significant weight to Dr. Bugarin's opinion is unsupported by substantial evidence. See 20 C.F.R. § 416.927(c); Mastro, 270 F.3d at 178 (stating that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight") (internal quotation marks and citation omitted). As discussed above, Mavins has failed to demonstrate that the ALJ's findings that Mavins's mental disorders are essentially stable when Mavins is medically compliant are unsupported by substantial evidence. Further, Mavins suggests that Dr. Bugarin's opinion is not based on a short period of treatment because Mavins previously sought treatment at LCMHC as early as 2004; however, as Dr. Bugarin's opinion expressly indicates that she first treated Mavins in February 2011, the court cannot say that the ALJ's finding was unsupported by substantial evidence.

The ALJ also considered Mavins's GAF score from his most recent psychiatric visit with Dr. Bugarin prior to the issuance of her opinion. While GAF scores are not alone a permissible indicator of disability and in fact have been discontinued in the DSM-V which was published in 2013, the ALJ is not precluded from considering them in determining whether a treating physician's opinion is consistent with her own treatment notes when evaluating the reliability of the physician's opinion regarding a claimant's level of functioning. See also Parker v. Astrue, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning"). Here, the ALJ appears to have considered Mavins's



GAF score not as an indicator of disability (or lack thereof), but rather as an inconsistency between Dr. Bugarin's treatment notes and her opinion. Further, consideration of this score this was not the sole reason the ALJ discounted Dr. Bugarin's opinion, and the ALJ expressly recognized earlier in the opinion that Mavins's records revealed lower GAF scores at times.

Finally, Mavins argues that the ALJ discounted Dr. Bugarin's opinion even though—according to Mavins—it was fairly consistent with the opinion of the first state agency reviewer. The first reviewer indicated that Mavins was moderately limited in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 290.) However, Dr. Bugarin opined that Mavins would have marked limitations in both of these functional areas. (Tr. 259.) Additionally, Mavins points out that Dr. Bugarin opined that Mavins would frequently suffer from deficiencies of concentration, persistence, and pace so severe that he would not be able to complete tasks in a timely manner (Tr. 260) and argues that this opinion is consistent with the first reviewer's indications that Mavins was moderately limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 294-95.)

The court disagrees that Mavins's interpretation of the evidence is mandated on this record. The limitations opined by Dr. Bugarin are clearly more severe than those opined by the first state agency reviewer. This conclusion is further supported by the first state agency reviewer's discussion of Dr. Bugarin's opinion (Tr. 292) and the first reviewer's residual functional capacity assessment that did not include such severe limitations. (Tr. 296.) Moreover, the court observes that the second

state agency reviewer's opinion, which was issued four months later and includes a review of additional records, is inconsistent with Dr. Bugarin's opinions.  (See Tr. 356-72.)

In sum, it is clear from the ALJ's decision that the ALJ, as part of his duties in weighing the evidence, properly relied on medical evidence in making his residual functional capacity determination and resolving conflicts of evidence.  Where the record contains conflicting medical evidence, it is the purview of the ALJ to consider and weigh the evidence, and resolve the conflict. See Craig, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence).  Moreover, the court finds that the ALJ's decision sufficiently reflects that he applied the requisite factors in weighing Dr. Bugarin's opinion.

For all of the these reasons, the court finds that Mavins has not shown that the ALJ's decision with regard to Dr. Bugarin's opinion was unsupported by substantial evidence or reached through application of an incorrect legal standard.

## RECOMMENDATION

For the foregoing reasons, the court finds that Mavins has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. See Craig, 76 F.3d at 589; see also 42 U.S.C. § 405(g); Coffman, 829 F.2d at 517. The court therefore recommends that the Commissioner's decision be affirmed.

May 12, 2015  
Columbia, South Carolina

Paige J. Gossett  
UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

>Robin L. Blume, Clerk
>United States District Court
>901 Richland Street
>Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).